IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BRADLEY TERWILLIGER, BENJAMIN MATCEK, and JIMMY DAN SMITH, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 1:16-CV-00599 |
| BRENT STROMAN, MANUEL CHAVEZ, ABELINO "ABEL" REYNA and JOHN DOE | § § § § | |
| Defendants. | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT
## AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Bradley Terwilliger, Benjamin Matcek, and Jimmy Dan Smith (hereinafter "Plaintiffs") file this, their Original Complaint, and in support, respectfully show the Court as follows:

## I. INTRODUCTION

1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 arising from the unlawful arrests that occurred in Waco, Texas on May 17, 2015. The mass arrests were unprecedented in both their scope and the complete absence of individual, particularized facts to establish probable cause. Plaintiffs are seeking damages against Defendants Police Chief Brent Stroman, Waco Police Department (hereinafter "WPD") officer Manuel Chavez, and Abelino "Abel" Reyna, in their individual capacities, for committing acts under color of law, which deprived Plaintiffs, as well as many other

persons, of rights secured under the Constitution and Laws of the United States. Plaintiffs also seek damages against an unnamed Texas Department of Public Safety employee for similar violations.

## II. <u>PARTIES</u>

2.      Plaintiff Bradley Terwilliger ("Terwilliger") is a resident of Bastrop County, Texas.

3.      Plaintiff Benjamin Matcek ("Matcek") is a resident of Brazos County, Texas.

4.      Plaintiff Jimmy Dan Smith ("Smith") is a resident of Burleson County, Texas.

5.      Chief Brent Stroman ("the Chief" or "Stroman"), is the Chief of Police of the Waco Police Department and is sued in his individual capacity. He acted under the color of law of the statutes, ordinances, regulations, policies, customs, and usages of the State of Texas. Defendant Stroman may be served with process at his place of business in the Waco Police Department, 3115 Pine Avenue, Waco, Texas, 76708.

6.      Det. Manuel Chavez ("Chavez"), is a police officer employed by the Waco Police Department. Chavez is sued in his individual capacity. He acted under the color of law of the statues, ordinances, regulations, policies, customs, and usages of the State of Texas and/or the City of Waco, Texas. Defendant Chavez has properly filed an appearance before this court. Defendant Chavez may be served with process at his place of business in the Waco Police Department, 3115 Pine Avenue, Waco, Texas, 76708.

7.     Abelino "Abel" Reyna ("Reyna"), is the elected District Attorney of McLennan County, Texas and is sued in his individual capacity. He acted under the color of law of the statues, ordinances, regulations, policies, customs, and usages of the State of Texas. Defendant Reyna may be served with process at 219 N. 6th Street, Waco, Texas 76701.

8.     John Doe is an employee of the Texas Department of Public Safety ("DPS") that as of this date is unnamed.

## II. <u>JURISDICTION</u>

9.     This action is brought pursuant to 42 U.S.C. § 1983. The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C § 1331, as this lawsuit arises under the Constitution, laws, or treaties of the United States.

## III. <u>VENUE</u>

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## IV. <u>FACTUAL BACKGROUND</u>

### <u>OVERVIEW</u>

11.     On May 17, 2015, hundreds of motorcycle enthusiasts from across the state gathered in Waco, Texas for a scheduled Texas Confederation of Clubs & Independents ("COC") meeting. As with any COC meeting, bikers expected to hear from speakers on topics ranging from state legislative updates to national motorcycle safety initiatives. The Waco COC meeting was also expected to be as much a social gathering as it was informative.

12.     Tragically, violence erupted and nine lives were lost, with others sustaining non-fatal injuries. Because law enforcement had become aware of friction between some members of the Bandidos Motorcycle Club ("Bandidos") and some members of the Cossacks Motorcycle Club ("Cossacks"), undercover and uniformed officers were located around the perimeters of the Twin Peaks restaurant where the COC meeting was occurring. These law enforcement officers were armed with assault rifles and responded to the violence with deadly force.

13.     It is undisputed that members of law enforcement fired upon individuals at the gathering, although it is yet unknown the extent of the injuries caused by law enforcement. Regardless of the manner or cause of the deaths, the loss of life that occurred that day is, without question, tragic. Unfortunately, the actions of law enforcement, including members of the McLennan County District Attorney's Office, compounded the tragedy by causing the wrongful arrest and incarceration of countless innocent individuals.

14.     Despite a total lack of particularized evidence relating to specific individuals, Defendants Stroman, Chavez, and Reyna determined that individuals would be arrested and charged with Engaging in Organized Criminal Activity based entirely on their presence at Twin Peaks, the motorcycle club that Defendants presumed an individual was associated with, and/or the clothing they were wearing at the time of the incident. Rather than investigating the incident and relying on actual facts to establish probable cause, Defendants theorized that a conspiracy of epic proportion

between dozens of people had taken place, and willfully ignored the total absence of facts to support their "theory."

15.     In the absence of particularized evidence to establish probable cause against Plaintiffs, Defendants caused an affidavit to be issued and sworn to by Defendant Chavez that contained material misrepresentations. Specifically, the affidavit alleges that Plaintiffs were members of a criminal street gang and that they regularly associate in the commission of criminal activities. As more fully set forth below, Plaintiffs are neither members of a criminal street gang, nor do they regularly associate in the commission of criminal activities.  Plaintiffs categorically deny the truthfulness or accuracy of either statement.  Defendants' conduct of alleging these "facts" against Plaintiffs when they, in fact, had no such evidence can only be construed as willful, intentional, and/or reckless.

**SPECIFIC FACTUAL ALLEGATIONS**

16.     The COC is a non-profit organization of motorcyclists with a mission to lobby for motorcyclist rights and safety legislation in the State of Texas.

17.     COC meetings are not held in any one specific city and are open to all motorcyclists.

18.     The May 17, 2015 COC meeting in Waco had been scheduled several weeks in advance, and was posted publicly on the COC website prior to the date of the event. Bikers from numerous motorcycle clubs from all over the state were expected to attend.

19.     Numerous motorcycle clubs were represented at the May 17th COC gathering. No law of the State of Texas or the United States prohibits an individual's right to associate with a motorcycle club. In fact, an individual's right to associate is guaranteed by the First Amendment to the United States Constitution.

20.     Prior to the May COC meeting, tension existed between certain members of the Bandidos Motorcycle Club and certain members of the Cossacks Motorcycle Club. This tension was known to law enforcement and as a result, law enforcement had officers present for the purpose of security and to monitor the gathering.

**THE INCIDENT**

21.     At approximately noon on May 17, 2015, an altercation occurred between several individuals. Within moments, the situation escalated and shots were fired. At its conclusion, nine individuals were killed and at least twenty were injured. To date, the total extent to which the fatalities and injuries were caused by gunfire from law enforcement officers remains unknown.  Autopsy and ballistics reports indicate that at least four of the deaths were the direct result of shots by law enforcement.

22.     As the gunfire erupted, video evidence conclusively proves that the vast majority of the individuals present at the location did not participate in any violent activity, but instead ran away from the gunfire or ducked for cover.

23.     Once the shooting ceased, law enforcement officers immediately took control of the premises. The individuals present were compliant and did not resist commands of law enforcement.

## INVESTIGATION

24. Defendant Chavez is a detective in the Special Crimes Unit of the WPD. On May 17, 2015, he was the on-call investigator and as a result, was called to the scene as the lead investigator of the Twin Peaks incident.

25. Defendant Reyna, the elected McLennan County District Attorney, and First Assistant District Attorney Michael Jarrett were on scene after the incident investigating the shooting, along with law enforcement officials from numerous local and state agencies. Defendant Reyna has publicly acknowledged that he took the unusual step of assisting law enforcement officials and was involved in the actual investigation of the incident.

26. After several hours, all individuals in attendance at the COC meeting were transported to the Waco Convention Center for interviews. For the remainder of the day, WPD detectives, Texas Rangers, and DPS special agents conducted interviews of those in attendance.

27. Initially, Defendant Chavez advised detectives and investigators to Mirandize each individual prior to questioning. However, at approximately 7:30 p.m. Defendant Chavez reversed course and instructed detectives and investigators to stop reading the *Miranda*[1] warnings, as the bikers were not under arrest.

28. Throughout the interviews, a common theme became evident – the detained individuals were merely present for a meeting, to visit with friends, eat food, and enjoy socializing with other motorcycle enthusiasts. During the interviews, it was

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

learned that most were nowhere near the shooting; many had just arrived at the restaurant; and none were aware of a prearranged plan of violence. It was also learned that the vast majority of the individuals immediately took cover at the outset of the gunfire, and did not in any way participate in or encourage the violence. Video evidence in the possession of law enforcement, and reviewed within hours of the incident, clearly demonstrates that the vast majority of those present, including Plaintiffs, appeared surprised and confused upon hearing the initial gunfire, and further, clearly shows the vast majority of those present, including Plaintiffs, running away from the disturbance, not toward it. The video evidence clearly and unambiguously proves the complete lack of involvement in the disturbance of the vast majority present, including Plaintiffs.

29. Investigators, many of whom were from the Austin division of DPS, were providing the information learned during interviews directly to Defendant Stroman, Defendant Reyna, and unknown DPS official(s).

30. Documents related to this incident clearly establish that a very specific plan for the release of most individuals was in the works just prior to the decision to arrest everyone and charge each person with the first degree felony of Engaging in Organized Criminal Activity with the Intent to Commit or Conspire to Commit Murder, Capital Murder, or Aggravated Assault.

**DEFENDANTS' DECISION TO ARREST**

31. Defendant Chavez ordered all of the investigators to stop their interviews at approximately 8:30 p.m. because Defendant Reyna had called a meeting. From

approximately 9:00 p.m. to 10:30 p.m., Defendants Stroman, Chavez, Reyna, and others met regarding the incident. Soon thereafter, investigators were informed that Defendants had decided to arrest all motorcyclists that met certain criteria, and to charge each with the offense of Engaging in Organized Criminal Activity.

32.     Defendant Stroman and/or Reyna provided an arrest criteria list for all detectives to follow in compiling the list of individuals to be arrested. Documents related to the mass arrests prove that Defendants made the determination to arrest based on motorcycle club association and/or clothing, patches, key chains, etc. that Defendants arbitrarily decided reflected "support" for either the Bandidos or the Cossacks.  In fact, much of the clothing, patches, key chains, etc. that Defendants claim signifies gang membership was, and remains, available for public purchase over the internet, at motorcycle gatherings, and in some retail stores throughout Texas.

33.     Defendant Stroman has publicly acknowledged his responsibility in the decision to arrest the 177, including Plaintiffs as described more fully below. Documents related to the incident clearly establish Defendant Reyna's responsibility for the ill-fated decision as well.  In a press conference following the mass arrests, Stroman verbally stated that he was responsible for the decision to make the mass arrests.

34.     Despite possessing video from numerous angles showing the complete lack of involvement of most of those arrested and hours and hours of interviews with the arrested individuals in which no evidence of a conspiracy was uncovered to support their "theory" of pre-planned violence, Defendants willfully, intentionally, and recklessly charged 177 individuals with the identical first degree felony of Engaging in

Organized Criminal Activity with the Intent to Commit or Conspire to Commit Murder, Capital Murder, or Aggravated Assault.

35.     To clarify, the decision to arrest and charge Plaintiffs and the other individuals with crimes despite video evidence, and statements from hundreds of witnesses, that ***directly contradict the existence of probable cause***, or any reasonable belief thereof, can only be characterized as willful, intentional, and/or reckless.  Based on the very specific information known by Defendants at the time their decision was made to arrest, including CLEAR and UNAMBIGUOUS video evidence directly at odds with Defendants' theory of a mass criminal enterprise engaging in organized crime, it is impossible to believe Defendants' conduct and decisions were anything other than willful, intentional, and/or reckless.  Defendants' decision to ignore contrary and exculpatory evidence in favor of a theory unsupported by the facts or the law was consciously made and therefore willful, intentional, and/or reckless.  Investigative reports and DPS witness summaries provide specific proof of the facts alleged herein.

**THE AFFIDAVIT TO OBTAIN AN ARREST WARRANT**

36.     On or about May 18, 2015, or May 19, 2015, Defendants caused a general warrant, as that term has been defined by the United States Supreme Court, to be used for the purpose of obtaining arrest warrants for each of the 177 individuals, including Plaintiffs.

37.     Despite the United States Constitution requiring a ***particularized*** showing of facts against an individual before a warrant can issue, an identical fill-in-the-name affidavit (hereinafter "affidavit" or "probable cause affidavit," attached hereto as

Exhibit 1) was used as the basis for establishing probable cause for each of the arrested individuals.

38.     It is indisputable that the affidavit in question **does not set forth particularized facts against Plaintiffs** that would in any way establish probable cause. Assuming *arguendo* that the probable cause affidavit contains specific allegations of fact against each Plaintiff, each such allegation is false and untrue.  As stated more fully below, Matcek and Smith were members of an independent motorcycle club with no affiliation or association to any other motorcycle club. Plaintiff Terwilliger was not a member of any motorcycle club. Accordingly, the probable cause affidavit is completely false in material ways as it relates to these Plaintiffs.

39.     The affidavit against each Plaintiff fails to set forth any specific facts that, if believed, would constitute probable cause.  Even if the claim that each Plaintiff is "a member of a criminal street gang" was true, and it is not, the affidavits lack any factual assertions specific to each Plaintiff upon which a finding of probable cause could be based.

40.     Defendant Chavez has acknowledged that he read the template affidavit and inserted names of individuals based on a list he was provided.  Chavez has testified in examining trials that he did not, in fact, possess personal knowledge of all the assertions made in the affidavit.  He has further testified to a lack of knowledge concerning individual arrestees' involvement in the incident.

41.     Defendant Chavez did not question the template affidavit or the basis of the criminal charge despite the fact that he had already begun the process of overseeing arrangements to release all of the detainees.

42.     Defendant Chavez swore to 177 template affidavits *en masse* – that is, he swore under oath that the stack before him was true and correct – and is the sole affiant for all affidavits. Chavez swore under oath he had personal knowledge of the information contained therein, even though he did not. Having read the affidavit, Defendant Chavez knew he did not have personal knowledge as to the particular facts of any one person, including Plaintiffs. Chavez knew that the affidavit was open-ended, false, and misleading in a material manner, yet he presented it to Magistrate Peterson for the purpose of obtaining arrest warrants, including Plaintiffs.

43.     The template affidavit, sworn to by Defendant Chavez, is wholly lacking in probable cause, and instead is filled with conclusory, inaccurate statements and/or background facts.  Plain and simple, the affidavit does not indicate any particular facts that Plaintiffs were even aware of tension that might have existed between certain individuals that were present at Twin Peaks.  The affidavit does not assert how, when, where, or with whom Plaintiffs conspired or to any facts that could be construed as a decision by Plaintiffs to engage in a conspiracy.  The affidavit is devoid of any facts describing any criminal activity in which Plaintiffs were believed to be involved.

44.     The affidavit falsely states that each Plaintiff is "a member of a criminal street gang." That statement is categorically *false*. It is an indisputable fact that Defendants did not possess any reliable, particularized information to indicate that

Plaintiffs themselves were members of a criminal street gang on or before the date such fact was sworn to by Defendant Chavez. Plaintiffs were not, and never have been, members of a criminal street gang. During all relevant time periods, Plaintiffs were not associated with any organization that meets any known definition of "criminal street gang." Plaintiffs were not, and never have agreed to be in a gang of any type, much less a "criminal street gang." Plaintiffs are law abiding citizens who associate with other law abiding citizens and in no way, shape, or form are members of a "criminal street gang." Plaintiffs were not included on any law enforcement lists as a "criminal street gang." Finally, no law enforcement list or database showed any of the Plaintiffs to be a "member of a criminal street gang" at the time of the incident or on the date on which Defendant Chavez swore to those facts for the purpose of establishing probable cause. As stated more fully below, Matcek and Smith were members of an independent motorcycle club with no affiliation or association to any other motorcycle club. Plaintiff Terwilliger was not a member of any motorcycle club.

45. Defendants Chavez, Stroman, and Reyna all knew the exact wording of the probable cause affidavit and knew at the time it was sworn to and presented to the magistrate for a determination of probable cause that it contained false statements. They knew the affidavit contained false and misleading statements because they were involved in every aspect of the investigation from the beginning, and knew or should have known that Plaintiffs were not members of a criminal street gang because no evidence existed that made such an assertion, and neither Plaintiffs nor the Line Riders were identified on any law enforcement database at the time of the incident in question

as being in a criminal street gang, or members of a criminal street gang. On the date that Plaintiffs were arrested and falsely charged, Defendants Chavez, Stroman, and Reyna all were privy to DPS gang databases and knew or should have known that none identified Plaintiffs as members of a criminal street gang. Nonetheless, each Defendant allowed the false statement to become a central basis for the arrests and detention of Plaintiffs.

46. Further, Defendants Chavez, Stroman, and Reyna all knew, or should have known, that Plaintiffs were not engaging in criminal conduct at Twin Peaks since the video evidence in their possession CLEARLY and UNAMBIGUOUSLY proves that Plaintiffs did not participate in, nor did they encourage, the disturbance that escalated into violence. In fact, the video evidence **proves** that Plaintiffs were **not** involved, yet the Defendants acted in direct contravention of the video evidence and caused Plaintiffs' constitutional rights to be violated. Each Defendant was certainly aware that neither he, nor any other law enforcement officer, possessed knowledge that Plaintiffs were a member of a criminal street gang, or that Plaintiffs regularly associated in the commission of criminal activities.

47. In the aftermath of the incident at Twin Peaks, Defendants apparently concluded that the Bill of Rights to the U.S. Constitution ceased to apply, and could be ignored given what they perceived as an immediate need to announce the re-establishment of law and order in their town.

48. Compounding Defendants' gross violations of civil rights, an identical one million dollars ($1,000,000.00) bail was set for each of the 177 detained individuals,

including Plaintiffs, despite the Eighth Amendment to the U. S. Constitution's clear mandate that "excessive bail shall not be required, nor excessive fines imposed..." As a result of all of the above, Plaintiffs were wrongfully incarcerated following their arrest.

## MISSTATEMENTS AND EXAGGERATIONS TO THE MEDIA

49.     Within hours of the Twin Peaks incident, information was provided to the media that was inaccurate, exaggerated, and highly misleading. Defendant Stroman allowed WPD representatives to set forth a narrative that was inaccurate in many respects. The "shootout between outlaw motorcycle gangs" theme that continues to be trumpeted is patently false. Perpetuating the narrative has caused irreparable harm to the reputations of the many individuals, including Plaintiffs, who had nothing to do with the fatalities and injuries.

50.     WPD's intent to create a false picture of the event is most evident in the manner that guns and knives were displayed to the media following the incident. The majority of the knives confiscated would not be considered illegal under § 46.02 of the Texas Penal Code, and were voluntarily relinquished upon requests from law enforcement soon after the shootings. Notwithstanding an individual's right to carry a legal knife, the knives were displayed to the media with blades extended in an effort to appear as menacing as possible.

51.     A similar storyline emerged regarding the number of guns seized after the incident, which was grossly overstated in initial reports. Police representatives omitted the truth that many of these guns were found outside the restaurant following the incident, stored safely on motorcycles or in other vehicles, as permitted by Texas law.

52.     Perhaps the most misleading characterization of the events was made days after the incident by Defendant Reyna when he implied that those arrested were guilty because "if they're victims, then they shouldn't have *any* problem coming to law enforcement and cooperating... and, at least in the first round of interviews, we ain't getting that." This is blatantly false. A review of investigators' records documenting the interviews that were conducted with the detained bikers clearly establishes that the vast majority, including Plaintiffs, were completely cooperative during interviews, and voluntarily submitted to questioning and requests for forensics (volunteering DNA samples and gunshot residue testing) from law enforcement. Defendant Reyna knew of these facts at the time he made the above described public statement.

53.     Since the outset, law enforcement's narrative of the event as told to the public bears little resemblance to the actual facts.

## V. <u>FACTS PERTAINING TO PLAINTIFFS</u>
### <u>Terwilliger</u>

54.     Bradley Terwilliger is a resident of Bastrop County, Texas. Plaintiff Terwilliger did not have any patches or vest, or jacket, or keychain that indicated membership in a motorcycle club, BECAUSE HE WAS NOT A MEMBER OF ANY MOTORCYCLE CLUB. Plaintiff Terwilliger is a father to a young child. He lost his job as a result of his arrest.

55.     Plaintiff is a motorcycle enthusiast and although he had some acquaintances that were in the Line Riders Motorcycle Club, Plaintiff Terwilliger was neither a member, nor a prospect.  He was NOT A MEMBER OF ANY MOTORCYCLE

CLUB AT THE TIME OF THE INCIDENT. He is not, nor has he ever been, a member of a criminal street gang.[2]

56.     Mr. Terwilliger rode to the Twin Peaks in Waco with friends for the purpose of attending the COC meeting and to socialize.  He heard gunshots shortly after he arrived and immediately took cover. Unfortunately, one of his friends, William Richardson, was struck by a stray bullet during their retreat.

57.     Plaintiff Terwilliger was engaged in **completely lawful conduct** at all times relevant to the Twin Peaks incident.

58.     Mr. Terwilliger's friendship with those in the Line Riders Motorcycle Club was lawful and did not violate any laws of Texas or the United States.

59.     Mr. Terwilliger's attendance at the COC meeting on May 17, 2015, was lawful and did not violate any laws of Texas or the United States.

60.     All clothing worn by Plaintiff Terwilliger on May 17, 2015, including jackets, vests, t-shirts, and patches, was completely lawful and did not violate any laws of Texas or the United States. Mr. Terwilliger was not wearing any clothing that would even suggest membership in a motorcycle club.

61.     Any stickers on Mr. Terwilliger's vehicle were completely lawful and did not violate any laws of Texas or the United States.

62.     Plaintiff Terwilliger did not shoot, strike, or threaten any person on May 17, 2015.

---

[2] See *supra* ¶ 44, which is incorporated herein by reference.

63.     Plaintiff Terwilliger did not encourage anyone to shoot, strike, or threaten any person on May 17, 2015.

64.     Mr. Terwilliger's actions upon hearing gun shots were consistent with what 99% of the population would do – he immediately took cover to avoid being struck. Further, Plaintiff Terwilliger called Plaintiff Matcek, who had yet to arrive at Twin Peaks in order to help their injured friend. Plaintiff Terwilliger relayed to Mr. Matcek that he had received permission by a Waco police officer to transport their injured friend to the hospital via private vehicle.

65.     In summary, Plaintiff Terwilliger had absolutely nothing to do with the tragic deaths and injuries that occurred on May 17, 2015, at Twin Peaks.

66.     The entire basis of Defendants' belief that probable cause existed to arrest and charge Plaintiff Terwilliger comes down to his presence at the Twin Peaks restaurant on May 17, 2015. The affidavit on which probable cause to arrest was based is false in every material way.

67.     The probable cause affidavit pertaining to Plaintiff Terwilliger and signed by Manuel Chavez **fails to identify even one single fact specific to him to support probable cause for his arrest and incarceration**.

68.     Mr. Terwilliger's cell phone has been examined by law enforcement and contains no evidence of any illegal plan or desire to engage in illegal conduct before, during, or after May 17, 2015.

69.     Video evidence conclusively shows that Plaintiff Terwilliger did not participate in, nor did he encourage anyone to participate in the violence.  The video

evidence shows Plaintiff Terwilliger acting in a lawful manner prior to and during the violence.

70.     Despite the lack of any indicia to establish probable cause, Plaintiff Terwilliger was arrested for Engaging in Organized Criminal Activity and his bond was initially set at one million dollars ($1,000,000). Plaintiff Terwilliger spent 14 days in jail. He was able to post bail after his bond was lowered.

## Matcek

71.     Benjamin Matcek is a resident of Burleson County, Texas. Plaintiff Matcek is a father and Third Degree Master Mason. Plaintiff Matcek is also a member of the Line Riders Motorcycle Club, which is known for their charitable work. In fact, on May 16, 2015, Mr. Matcek had completed a 100-mile charitable ride for the organization Bikers Against Child Abuse (BACA) with various other motorcycle groups.

72.     The Line Riders Motorcycle Club is not a criminal street gang, and have never been considered a criminal street gang before the events of May 17, 2015. Specifically, Mr. Matcek is not, nor has he ever been, a member of a criminal street gang.[3]

73.     The Line Riders Motorcycle Club is AN INDEPENDENT MOTORCYCLE CLUB WITH NO AFFILIATION OR ASSOCIATION TO ANY OTHER MOTORCYCLE CLUB. Defendants were aware of this fact at the time that Mr. Matcek was arrested and charged with Engaging in Organized Criminal Activity. Defendants were aware that the Line Riders were not affiliated or associated with any other motorcycle club because

---

[3] See *supra* ¶ 44, which is incorporated herein by reference.

a detective in the gang unit with the Waco PD, who was working closely with Defendants, expressly told Terwilliger, Matcek, and Smith on the evening of May 17, 2015 that he had determined that the Line Riders were an independent club with no affiliation or association to any other club. For that reason, Plaintiffs were housed at the McLennan County jail in an area completely separated from other motorcycle clubs. Plaintiffs were expressly told that they were housed in this manner because they were not affiliated or associated with any other club that was present at Twin Peaks.

74. Because Mr. Matcek was running late, he WAS NOT PRESENT AT TWIN PEAKS WHEN THE VIOLENCE OCCURRED. While en route to Twin Peaks, Mr. Matcek received a phone call from Plaintiff Terwilliger, and Matcek was told that their friend William Richardson had been shot. Mr. Matcek was asked to pick them up and transport the injured man to the hospital. They had permission from the Waco PD to transport Mr. Richardson, and documents related to the Twin Peaks investigation confirm this fact.

75. After leaving the hospital, Mr. Matcek, along with Terwilliger, Smith, and William Black pulled into the parking lot of a closed business to regroup and process the traumatic events. While in the parking lot, Waco police officers approached the vehicle, and eventually decided to arrest Plaintiffs Matcek, Terwilliger, and Smith. Plaintiff Matcek was initially arrested and charged with criminal trespass and UCW. Mr. Matcek bonded out of jail on those charges two days later on May 19, 2015. After Mr. Matcek was released from jail, a warrant for Engaging in Organized Criminal

Activity was issued for him. Mr. Matcek was arrested based on the Engaging in Organized Criminal Activity warrant on May 20, 2015.

76.     Plaintiff Matcek was engaged in **completely lawful conduct** at all times relevant to the Twin Peaks incident. In fact, he **was not even at the Twin Peaks location when the violence occurred**.

77.     Mr. Matcek's friendship with those in the Line Riders Motorcycle Club was lawful and did not violate any laws of Texas or the United States.

78.     All clothing worn by Plaintiff Matcek on May 17, 2015, was completely lawful and did not violate any laws of Texas or the United States.  In fact, Mr. Matcek was not even wearing a vest at the time he was initially arrested.

79.     All stickers on Mr. Matcek's truck were completely lawful and did not violate any laws of Texas or the United States.

80.     Plaintiff Matcek did not shoot, strike, or threaten any person on May 17, 2015, BECAUSE HE WAS NOT EVEN PRESENT AT THE LOCATION WHEN THE VIOLENCE OCCURRED.

81.     Plaintiff Matcek did not encourage anyone to shoot, strike, or threaten any person on May 17, 2015, BECAUSE HE WAS NOT EVEN PRESENT AT THE LOCATION WHEN THE VIOLENCE OCCURRED.

82.     For the reasons stated above, Plaintiff Matcek had absolutely nothing to do with the tragic deaths and injuries that occurred on May 17, 2015, at Twin Peak.

83.     Since Mr. Matcek was not present and is a member of an independent motorcycle club, the entire basis of Defendants' belief that probable cause existed to

arrest and charge him with Engaging in Organized Criminal Activity is false. All aspects of the affidavit on which probable cause to arrest was based are false.

84.     The probable cause affidavit signed by Manuel Chavez on May 19, 2015 **fails to identify even one single fact specific to Plaintiff Matcek to support probable cause for his arrest and incarceration**.

85.     Mr. Matcek's cell phone has been examined by law enforcement and contains no evidence of any illegal plan or desire to engage in illegal conduct before, during, or after May 17, 2015.

86.     Despite the lack of any indicia to establish probable cause, Plaintiff Matcek was arrested for Engaging in Organized Criminal Activity and his bond was initially set at one million dollars ($1,000,000). Plaintiff Matcek spent 14 days in jail. He was able to post bail after his bond was lowered.

### Smith

87.     Jimmy Dan Smith is a resident of Burleson County, Texas. Plaintiff Smith is a dedicated husband and a heavy equipment shop manager. Plaintiff Smith is also a member of the Line Riders Motorcycle Club.

88.     As stated above, the Line Riders Motorcycle Club is not a criminal street gang, and have never been considered a criminal street gang before the events of May 17, 2015. Specifically, Mr. Smith is not, nor has he ever been, a member of a criminal street gang.[4]

---

[4] See *supra* ¶ 44, which is incorporated herein by reference.

89.     The Line Riders Motorcycle Club is AN INDEPENDENT MOTORCYCLE CLUB WITH NO AFFILIATION OR ASSOCIATION TO ANY OTHER MOTORCYCLE CLUB. Defendants were aware of this fact at the time that Mr. Smith was arrested and charged with Engaging in Organized Criminal Activity. Plaintiffs know that Defendants were aware that the Line Riders were not affiliated or associated with any other motorcycle club because a detective in the gang unit with the Waco PD, who was working closely with Defendants, expressly told Terwilliger, Matcek, and Smith that he had determined that the Line Riders were an independent club with no affiliation or association to any other club. For that reason, Plaintiffs were housed at the McLennan County jail in an area completely separated from other motorcycle clubs. Plaintiffs were expressly told that they were housed in this manner because they were not affiliated or associated with any other club that was present at Twin Peaks.

90.     Mr. Smith rode to the Twin Peaks in Waco with friends for the purpose of attending the COC meeting and to socialize.  He heard gunshots shortly after he arrived and immediately took cover. Unfortunately, one of his friends was struck by a stray bullet during their retreat. Plaintiff Terwilliger called Plaintiff Matcek, asking him to pick up Terwilliger, Smith, and their injured friend from Twin Peaks. Plaintiff Matcek did so.

91.     After leaving the hospital, Mr. Smith, along with Terwilliger, Matcek and William Black pulled into the parking lot of a closed business to regroup and process the traumatic events. While in the parking lot, Waco police officers approached the vehicle, and eventually decided to arrest Plaintiffs Matcek, Terwilliger, and Smith.

Plaintiff Smith was initially arrested and charged with Directing Activities of Criminal Street Gangs, even though he did not meet any of the elements whatsoever. TEXAS PENAL CODE §71.023. Days later, a second charge for Engaging in Organized Criminal Activity was added.

92.     Plaintiff Smith was engaged in **completely lawful conduct** at all times relevant to the Twin Peaks incident.

93.     Mr. Smith's membership in the Line Riders Motorcycle Club was lawful and did not violate any laws of Texas or the United States.

94.     Mr. Smith's attendance at the COC meeting on May 17, 2015, was lawful and did not violate any laws of Texas or the United States.

95.     All clothing worn by Plaintiff Smith on May 17, 2015, including jackets, vests, t-shirts, and patches, was completely lawful and did not violate any laws of Texas or the United States.

96.     Any stickers on Mr. Smith's vehicle were completely lawful and did not violate any laws of Texas or the United States.

97.     Plaintiff Smith did not shoot, strike, or threaten any person on May 17, 2015.

98.     Plaintiff Smith did not encourage anyone to shoot, strike, or threaten any person on May 17, 2015.

99.     Mr. Smith's actions upon hearing gun shots were consistent with what 99% of the population would do – he immediately took cover to avoid being struck.

100.    In summary, Plaintiff Smith had absolutely nothing to do with the tragic deaths and injuries that occurred on May 17, 2015, at Twin Peaks.

101.    The entire basis of Defendants' belief that probable cause existed to arrest and charge Plaintiff Smith comes down to his presence at the Twin Peaks restaurant on May 17, 2015. All other assertions of fact against Plaintiff Smith, if any, contained in the affidavit on which probable cause to arrest was based are false.

102.    The probable cause affidavit signed by Manuel Chavez **fails to identify even one single fact specific to Plaintiff Smith to support probable cause for his arrest and incarceration**.

103.    Mr. Smith's cell phone has been examined by law enforcement and contains no evidence of any illegal plan or desire to engage in illegal conduct before, during, or after May 17, 2015.

104.    Video evidence conclusively shows that Plaintiff Smith did not participate in, nor did he encourage anyone to participate in the violence. The video evidence shows Plaintiff Smith acting in a lawful manner prior to and during the violence.

105.    Despite the lack of any indicia to establish probable cause, Plaintiff Smith was charged with Engaging in Organized Criminal Activity and his bond was initially set at one million dollars ($1,000,000). Plaintiff spent 16 days in jail. He was able to post bail after his bond was lowered.

## V. CAUSES OF ACTION

### 42 U.S.C. § 1983 – 4th Amendment Violation
### pursuant to *Malley v. Briggs*

106.    Paragraphs 1-105 are incorporated herein by reference.

107.     Plaintiffs had a clearly established Constitutional right to be free from unlawful arrest. As a direct result of Defendants' conduct, Plaintiffs were falsely arrested and charged with Engaging in Organized Criminal Activity, despite the absence of probable cause to establish that each had committed a crime. Defendants' conduct, as described above, deprived Plaintiffs of their right to be secure in their persons against unreasonable seizure, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. § 1983.

108.     The Fourth Amendment of the U.S. Constitution states,

> "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, **and no warrants shall issue, but upon probable cause**, supported by oath or affirmation, and **particularly describing** the place to be searched, and the persons or things to be seized." (*Emphasis added.*)

As the Supreme Court of the United States has plainly stated, "**[w]here the standard is probable cause, a**... **seizure of a person must be supported by probable cause particularized with respect to that person**." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).[5]

109.     Plaintiffs plead that Defendants Stroman and Reyna knowingly and intentionally, or with reckless disregard for the truth, caused a facially deficient, fill-in-

---

[5]   *See also Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("...**the belief of guilt must be particularized with respect to the person to be searched or seized.**"); *Trapper v. North Carolina*, 451 U.S. 997, 1000 (1981); *Michigan v. Summers*, 452 U.S. 692, 695, n. 4 (1981); *U.S. v. Hearn*, 563 F.3d 95, 103 (5th Cir. 2009) (quoting *Ybarra*, 444 U.S. at 91); *U.S. v. Zavala*, 541 F.3d 562, 575 (5th Cir. 2008); *Williams v. Kaufman Co.*, 352 F.3d 994, 1003 (5th Cir. 2003) (quoting *Ybarra*, 444 U.S. at 91); *Merchant v. Bauer*, 677 F.3d 656, 666 (4th Cir. 2012) ("**The Supreme Court has emphasized that '[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.'**"); *Hawkins v. Mitchell, et al*, 983, 994 (7th Cir. 2014); *U.S. v. Ojeda-Ramos*, 455 F.3d 1178, 1181 (10th Cir. 2006) (quoting *Ybarra*, 444 U.S. at 91); *U.S. v. Guzman*, SA-13-CR-89-DAE (W.D. Tex. 2013); *Dinler v. City of New York*, 2012 WL 4513352 *6 (S.D.N.Y 2012) ("**The Fourth Amendment does not recognize guilty by association.**").

the-name template affidavit, completely lacking in particularized facts against them to be presented to the Magistrate Judge for the purpose of obtaining an arrest warrant.[6]

110.    Further, Defendant Chavez is liable to Plaintiffs because he knowingly and intentionally, or with reckless disregard for the truth, presented a facially deficient, fill-in-the-name template affidavit, completely lacking in particularized facts against Plaintiffs to be presented to the Magistrate Judge for the purpose of obtaining arrest warrants. A police officer is not entitled to qualified immunity when he submits a warrant application that is so lacking in indicia of probable cause as to render official belief in its existence unreasonable. *Malley v. Briggs*, 475 U. S. 335, 345, 106 S. Ct. 1092, 1098, 89 L.Ed.2d 271 (1986). As noted in footnote 8, this principle has been re-established time and again. The Fifth Circuit has held likewise. No reasonable police officer or law enforcement actor could reasonably have believed the law was otherwise, or that the affidavit in question established probable cause against Plaintiffs.

111.    Because the template affidavits regarding Plaintiffs lack assertions of fact that, even if true, would establish probable cause, Defendants have each, individually and as a group, violated Plaintiffs' Fourth Amendment rights.

112.    "The Fourth Amendment directs that 'no Warrants shall issue, but upon probable cause... and particularly describing the place to be searched, and the persons or things to be seized.' Thus, 'open-ended' or 'general' warrants are constitutionally prohibited." *Ybarra v. Illinois*, 444 U.S. 85, 92 n. 4 (1979). It was well settled law in this country prior to May 17, 2015 that use of a general warrant application was prohibited.

---

[6] See *supra* ¶¶ 34, 46, and 73 for specific, detailed allegations of Defendants' conduct and why that conduct is willful, intentional, or with reckless disregard.

Defendants' actions effectively constitute the use of a general warrant prohibited by the Constitution and decades of United States Supreme Court case law.

113.    As set forth in *Malley v. Briggs*, and its progeny, Plaintiffs' Fourth Amendment rights were violated when a probable cause affidavit was presented for the purpose of obtaining an arrest warrant that was so lacking in indicia of probable cause as to render official belief in existence of probable cause "unreasonable."

114.    The affidavit, attached as Exhibit 1 to this Complaint, contains identical language to the affidavits used to establish probable cause against Plaintiffs, and is incorporated herein by reference. The plain language of the affidavit indicates that it does not contain a single particularized assertion of fact against any Plaintiff that would establish a reasonable belief that any Plaintiff has committed a criminal offense.

115.    As a direct result of Defendants' conduct and actions, Plaintiffs were deprived of their constitutional rights all to their damages.

## 42 U.S.C. § 1983 – 4th Amendment Violation
### Pursuant to *Franks v. Delaware*

116.    Paragraphs 1-115 are incorporated herein by reference.

117.    In the alternative, Plaintiffs plead civil liability against Defendants based on a "*Franks*" violation. *See Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978); *see also Hale v. Fish*, 899 F.2d 390, 400 n.3 (5th Cir. 1990). Defendants Stroman and Reyna knowingly and intentionally, or with reckless disregard for the truth, caused an affidavit against each Plaintiff to be presented to the Magistrate Judge that each

knew to be materially false and misleading.[7]  Further, Defendant Chavez is liable to Plaintiffs because he knowingly and intentionally, or with reckless disregard for the truth, swore to probable cause affidavits against Plaintiffs that he knew to be materially false and misleading, and presented them to the Magistrate Judge.

118.    Defendant Chavez swore under oath that he had personal knowledge of the information set forth in the probable cause affidavits. He did not.

119.    The affidavits falsely state that each Plaintiff is "a member of a criminal street gang." That statement is categorically *false*. It is an indisputable fact that Defendants did not possess any reliable particularized information to indicate that Plaintiffs themselves were members of a criminal street gang on or before the date such fact was sworn to by Defendant Chavez. Plaintiffs were not, and never have been, members of a criminal street gang. In fact, Plaintiff Matcek and Plaintiff Smith were members of an independent motorcycle club with no affiliation or association to any other motorcycle club. As stated above, Plaintiff Terwilliger was not a member of any motorcycle club on the date in question.

120.    Further, the probable cause affidavits state, "[a]fter the altercation, the subject was apprehended at the scene, while wearing common identifying distinctive signs or symbols **or** had an identifiable leadership or continuously **or regularly associate in the commission of criminal activities**." These statements are false and misleading and were known to be false and misleading by Defendant Chavez at the time he swore to such.  Defendants offer no specific facts of any nature that Plaintiffs

---

[7] See *supra* ¶¶ 34, 46, and 73 for specific, detailed allegations of Defendants' conduct and why that conduct is willful, intentional, or with reckless disregard.

regularly associated in the commission of criminal activities.[8]  In fact, the probable cause affidavits misstate an essential element of the definition of "criminal street gang". Texas Penal Code § 71.01(d) states that "'Criminal street gang' means three or more persons having a common identifying sign or symbol or an identifiable leadership **who continuously or regularly associate in the commission of criminal activities**."  There is no "or" before "who continuously or regularly . . ." The last phrase MUST be proven as an essential element of the definition.  The omission of this essential element, or language suggesting that it is not an essential element, is misleading on its face.  Since Defendant Chavez testified before the Grand Jury, it is reasonable to believe that Defendant Chavez testified consistent with his sworn affidavit.  As outlined above, the Chavez affidavit contains false and materially misleading statements, or it misled the Grand Jury by suggesting that the definition of "criminal street gang" is different than actually stated in the Penal Code.

121.    Information omitted from the affidavit by Defendant Chavez would have negated probable cause. Despite a duty to include information that weighs against probable cause, Defendant Chavez knowingly and intentionally, or with reckless disregard for the truth, failed to reference the complete lack of any particularized evidence connecting Plaintiffs to the deaths or injuries that occurred at Twin Peaks.

122.    Since at least *Franks v. Delaware,* and as re-affirmed by the Fifth Circuit in *Hale v. Fish*, police officers and law enforcement officials have known that willful, intentional, and/or reckless misrepresentations made for the purpose of establishing

---

[8] Plaintiffs categorically deny that they continuously or regularly associated in the commission of criminal activities.

probable cause violate an individual's Fourth Amendment rights. As a direct result of Defendants' conduct and actions, Plaintiffs were wrongfully arrested even though probable cause did not exist.

## 42 U.S.C. § 1983 – 14th Amendment Violation

123. Paragraphs 1-122 are incorporated herein by reference.

124. If it is determined that a Fourth Amendment violation is not sustainable, Plaintiffs alternatively assert a violation of their Due Process rights under the Fourteenth Amendment to be free from unlawful arrest as a result of false and misleading statements that were knowingly, or with reckless disregard included in the probable cause affidavits. The Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression.

125. Specifically, Plaintiffs have rights guaranteed by the Fourteenth Amendment not to have law enforcement deliberately fabricate evidence, including the insertion of facts in affidavits and arrest documents (and provide testimony based on those "facts" to secure an indictment), that Defendants know to be false.

126. Here, Defendants knew there was no basis for the claims that Plaintiffs were members of a criminal street gang who committed or conspired to commit murder, capital murder, or aggravated assault. Further, Defendants knew there was no basis for the claim that Plaintiff Matcek was "apprehended at the scene." By inserting such claims in the probable cause affidavit and other official documents related to

Plaintiffs' arrests, Defendants violated Plaintiffs' Fourteenth Amendment rights. This is conduct sufficient to shock the conscience for substantive due process purposes.

127. The doctrine set forth by the Fifth Circuit in *Cole v. Carson*, 802 F.3d 752 (5th Cir. 2015) is hereby invoked and pled.

### 42 U.S.C. § 1983 – Conspiracy

128. Paragraphs 1-127 are incorporated herein by reference.

129. In the hours and days immediately following the incident, Defendants Stroman, Chavez, Reyna, and Doe entered into a conspiracy to deprive Plaintiffs of their right to be free from unlawful seizure and incarceration in violation of his Fourth Amendment rights. Defendants acted in concert either to orchestrate or to carry out the illegal seizure and cause the illegal arrest and incarceration described in this Complaint when they knew there was no probable cause to arrest them or to charge them with the offenses of Engaging in Organized Criminal Activity. Defendants are liable to Plaintiffs for their violations of the Fourth Amendment under 42 U.S.C. § 1983.

130. As described above, Defendants Stroman, Chavez, Reyna, and Doe caused a warrant to be issued against Plaintiffs based on a false or deficient probable cause affidavits that Defendants knew to be false or deficient.

131. Defendants were aware that Chavez was swearing to false statements for the purpose of obtaining an arrest warrant yet took no action to stop him. In fact, as described above, they encouraged Chavez despite knowledge of video evidence that directly contradicted any reasonable belief that Plaintiffs had committed a crime. Defendants Reyna and Stroman's encouragement of Chavez is evident in that

Defendants Stroman and Reyna and Chavez met together on May 17 and May 18 to discuss this very issue and records indicate full knowledge and acquiescence by all Defendants. Public statements by Stroman and Reyna further confirm Defendants' awareness of the actions taken to cause Plaintiffs to be arrested without probable cause.

132. The conspiracy involved state action, as Defendants Stroman, Chavez, Reyna, and Doe acted under color of the statutes, customs, ordinances, and usage of the State of Texas.

133. As a direct result of Defendants' illegal conduct, Plaintiffs were deprived of their constitutional rights, all to their damages.

**Defendant Reyna is not entitled to immunity.**

134. Defendant Reyna investigated the scene within hours of the incident, took photographs of the scene, reviewed information as it became known, and in all respects inserted himself in the role of an investigator/detective. Defendant Reyna was not acting as an advocate/prosecutor in assisting with the mere preparation of the affidavit for an arrest warrant, but rather involved himself in the investigative phase of the case **prior to a determination of probable cause**, and thus, is not entitled to absolute prosecutorial immunity. To the extent Reyna provided legal advice, it was provided to police and other law enforcement officials **during the investigative phase**. Defendant Reyna involved himself in the decision to arrest when he called the meeting described above and changed the course of earlier decisions to release most of those detained, including Plaintiffs. In fact, it was Chief Stroman and Reyna who ultimately decided to charge each individual who met certain established criteria related to club affiliation

and/or clothing, patches, bumper stickers, etc. that in their minds suggested "support" for either the Bandidos or the Cossacks.

## VI. DAMAGES

135.    As a direct and proximate result of the acts and omissions outlined above, each Plaintiff has been severely damaged.  Each Defendant, acting individually, or in concert with the other Defendants, has caused each Plaintiff to suffer the damages described below.

136.    Each Plaintiff seeks compensatory damages in an amount deemed sufficient by the trier of fact to compensate them for their damages, which includes past and future mental anguish, past and future pain and suffering, past and future damage to their reputations, and past and future lost wages and lost earning capacities.

137.    Each Plaintiff also seeks damages as a result of Defendants' actions and conduct that have impinged on rights guaranteed by the First Amendment, such as Plaintiffs' right to free speech, and to association. Conditions placed on Plaintiffs' bonds have deprived Plaintiffs of rights guaranteed by the Constitution. It was entirely foreseeable to Defendants that falsely arresting and charging Plaintiffs with a criminal offense for which probable cause was lacking would lead to these constitutional deprivations and damages.

138.    Each Plaintiff also seeks damages for the costs they incurred in having to post bail and defend against the false criminal charges filed against them.  Those costs include the money they paid for legal representation.

139.    Each Plaintiff also seeks exemplary damages against each Defendant.

140.    Each Plaintiff has retained the services of the undersigned counsel, and claim entitlement to an award of reasonable and necessary attorney's fees under 42 U.S.C. § 1983 and 1988.

## VII. JURY DEMAND

141.    Plaintiffs respectfully request a trial by jury.

## PRAYER FOR RELIEF

For these reasons, each Plaintiff seeks a judgment against Defendants for:

a.    compensatory and actual damages in an amount deemed sufficient by the trier of fact;

b.    exemplary damages;

c.    attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988;

d.    costs of court; and

e.    interest allowed by law for prejudgment or post-judgment interest.

Respectfully submitted,

By:  /s/ *Don Tittle*
Don Tittle
State Bar No. 20080200
don@dontittlelaw.com

LAW OFFICES OF DON TITTLE, PLLC
6301 Gaston Avenue, Suite 440
Dallas, Texas  75214
214/522-8400
214/389-1002 – Fax
*Lead Counsel for Plaintiffs*

C. Daniel Jones III (Dan Jones)
State Bar No. 24065512
GRAY, GRANBERRY AND JONES
103 Main Street
Bryan, Texas 77803
Tel: (979) 822-4759
Fax: (979) 779-0575

*ATTORNEYS FOR PLAINTIFFS*